Kent, Ch. J.
delivered the opinion of the court. This is a clear case for the plaintiffs. Their claim is founded on sound principles in the law of insurance. The defendants abandon, and the plaintiffs accept and pay. They were then substituted for the defendants, and succeeded to the benefit of the acts of the agent abroad, in relation to the property in question. The master and merchants at Mala-ga acted, nominally, as agents for the defendants, but, in reality, they were agents for the party having the ultimate claim to the property. What they did was, undoubtedly, founded on previous instructions from the defendants, and on the connexion that the defendants had with the property, as former proprietors, and existing claimants. When the defendants abandoned the ship and cargo, and received their indemnity from the plaintiffs, they renounced all concern in the interference of their agents, and transferred to *283 the insurer the result of that interference. This is settled doctrine in respect to abandonment. The present case is analogous to that of capture and subsequent ransom, where, upon an accepted abandonment, the whole benefit of the composition, and the effects reclaimed, go to the insurer.
There is no ground for considering the purchase by the house of Grrevigne & Co. as made for the defendants, in the character of strangers to the property. It was' made for the defendants as having an interest in it, and with intent to mitigate the loss. The law of abandonment applies to such a case with the greatest justice and good policy in making the previous instructions, and all acts of the agent enure to the insurer. To give to the insured a full indemnity on his policy, and also the advantages of these efforts of the agents to repair the loss, would be doubly injurious to the insurer. It would deprive him of the benefit of his substitution, tend to slacken the exertions of agents to recover the property, and invite them to resort to fraudulent speculations upon the loss. It cannot be admitted, that the condemnation at Malaga put an end to the interest of the insured, so as to render a purchase, ’by him, thereafter, equivalent to a purchase by a stranger. In the case of M’Masters v. Shoolbred, 1 Esp. Rep. 237, the vessel was condemned by the French consul, sold by him as a prize, and the captain purchased her at such sale on account of the owners. But it was considered as so much property recovered *by the assured, and it was likened, by Lord Kenyon, to the case of ransoms. The condemnation, and change thereby of the legal title, wafe not considered as .any impediment to the doctrine that the assured, by a recovery in that mode, had sustained only an average loss. That case differs from this in one particular only; that here was an abandonment and payment of a total loss. It was admitted in the case I have cited, that if the insured, upon the capture, had abandoned he might have recovered a total loss. But then upon the very principles of abandonment, (and which that case did not mean to question,} *284 the property so recovered, to use Lord Kenyon’s expression, must have enured to the benefit of the insurer. It is a principle perfectly well settled, that abandonment has a retrospective effect, so as to make the insurer to be regarded as the proprietor ab initio. The insurer is put in the place of the insured, and the latter is considered as if he had not existed, according to the language of some of the books. Putting out of view, as the case in Espinasse certainly does, any material operation from the fact of condemnation, I cannot see any difficulty in the question. Suppose there had not been a condemnation, but the insured had, by their agent, purchased, or recovered the property, immediately upon the capture, and before this technical change of title by condemnation, I apprehend there would, in that case, be no question but that the assured, when he abandons, parts also with the benefit of his repurchase. The consequences would,'otherwise, be most unjust towards the insurer, and the insured would turn his contract from one of indemnity into one of gain. If the condemnation in this case creates no difficulty, no other exists. The insurer was not bound, unless he pleased, to accept of the purchase at Malaga; nor was the insured. The agent purchased at his peril. There can be no risk, therefore, that this doctrine will involve insurers in hazardous mercantile concerns. They have nothing to do with them, but at their election. After an accepted abandonment, they can, if they please, accept of the repurchase by the agent, and affirm his acts, or they may leave them to fall upon the agent. The French ordinance of marine has made provision for this very case of repurchase after capture, and it ordains that the insurers may take the composition for their own benefit, or they may, at their election, refuse to have anything to do with the repurchase, and content themselves with paying a total loss. So also, on the other hand, the assured may refuse to ratify *the repurchase, and for this reason, says Valin, it behoves the agent to act with great circumspection and prudence. *285 Ord. Art. 66 and 67; 2 Val. 159, 160. See also 1 Emer. 464, and s. 21. 1 agree that tbe insurer is always bound to decide promptly, wbetber or no be claims tbe benefits of the repurchase; but as that point is not drawn in ques tion in tbe present case, I intend that no objection exists on that ground. Tbe repurchases, authorized by tbe French law, are as applicable to cases where tbe vessel has been condemned as where she has not. For by tbe law of nations, as understood when these ordinances were established, a capture and carrying into port, or infra proesidia, so as to take away from tbe captured the hope of recovery, as effectually changed the property as a sense of condemnation will do at this day.
In the case of Gross v. Withers, 2 Burr. 694, the doctrine of capture underwent a very learned investigation; and Lord Mansfield, in giving the opinion of the court, observed, that if after condemnation the owner recovers, or takes his captured ship, the insurer can be in no other condition that if she had been recovered or taken before condemnation. The reason is plain from the nature of the contract. The insurer runs the risk of the insured, and undertakes to indemnify. He must, therefore, bear the loss actually sustained, and can be liable to no more. So that, if after condemnation, the owner recovers the ship in her complete condition, but has paid salvage, or been at any expense in getting her back, the insurer must bear the loss so actually sustained. He observes, in another place, that no capture by an enemy, though condemned, can be so total a loss as to leave no possibility of recovery. Page 696.
I agree, that after a condemnation, the property is changed, so that a complete title can be transferred from the captor to a third person. But this rule does not apply between insurer and insured, so as to authorize the insured to be that purchaser, at the very time of the loss, and with the express view of indemnifying himself against a part of it. If he does, - and still claims a total loss from the insurer be must tender to bim tbe benefit of that purchase. Tbis rule is founded on tbe clearest justice, and is essential to prevent fraud. As long as tbe property remains in tbe bands of tbe captor, although a condemnation has taken place, there is still tbe possibility of a recovery. There still exists, as a rod over tbe captor, the right of appeal; and tbis, and other circumstances *which may be peculiar to tbe case, will always induce tbe chance of a favorable composition and purchase, on tbe part of tbe claimant. That chance is valuable, and ought, on abandonment, to go to tbe insurer. In tbe present case, however, tbe assured takes bis total loss from tbe underwriter, makes bis favorable terms with the captor, and insists on retaining both. This is not to be permitted, and I cannot pursuade myself that it ever was permitted by tbe insurance law of any country.
Tbe case of Saidler and Craig v. Church, decided in tbis court, in July term, 1799, is an authority in point, and must govern tbe present case. That was an insurance on a vessel, which was captured, condemned, and afterwards purchased by tbe master, on account of tbe owners, of whom be was one. As soon as tbe capture was known, and before tbe condemnation and purchase, tbe insured abandoned, but after tbe purchase, tbe owners fitted out the vessel, and sent her on another voyage. Tbe court held that tbe assured, by affirming tbe purchase of tbe captain, as their agent, bad waived tbe abandonment, and turned the total into an average loss. That if tbe insured bad intended to pursue their claim to a total loss, „hey ought not to have ratified tbe act of their captain, but left tbe insurer to reap, at bis election, tbe benefit of that purchase. Tbis case cannot be separated from the present one by any solid distinction; and I should be sorry to question, in any degree, the authority of that decision. The case of Abbott v. Broome, 1 Caines’ Rep. 292, was not intended, in any respect, to shake tbe force of it. I,took no part in tbe latter decision; but it appears, from tbe re* *286 port of tbe case, tbat it was clearly to be distinguished, from tbat of Saidler and Craig v. Church (Vide, vol. 1, 803,) and tbe latter appears to have been uniformly considered by tbe counsel and court as a valid authority. I conclude, therefore, botb from authority and principle, tbat tbe plaintiffs are entitled to recover.
LIVINGSTON, J.
Tbe more I reflect on tbe nature o* this claim, tbe more extraordinary, not to say extravagant, it appears. I am at a loss to discover any ground on which it can be supported. Those relied on are, tbat tbe purchase of tbe cargo being in trust for its ultimate owners, tbe plaintiffs must be exclusively entitled to the profits, inasmuch as by tbe abandonment, and payment of a total loss, they became proprietors thereof. These arguments proceed on tbe *hy|)otbesis, tbat goods, even after condemnation, belong to the original proprietors, or, in case of abandonment, to tbe assurer, and tbat tbe assured and his factors continue, after such an event, his agents, and are authorized to purchase for him tbe whole, or any part of tbe property condemned. But neither of these positions will be found correct. After condemnation there is an end of tbe interest both of tbe owner and underwriter in tbe property confiscated, except so far as regards the right of appeal; and even in case of reversal of tbe sentence, neither party would receive the property in kind, but its appraised value, or tbe price at which -it had been fairly sold. Tiras, if an appeal had been successfully prosecuted here, the underwriters, in virtue of the abandonment, wQuld have been, entitled, at most, to the sum at which the captor sold the property, admitting the sale to have been fair, and could not by action of trover, or otherwise, pursue the property itself, the title to which had been thus changed by condemnation. The moment sentence is pronounced, the right of the captors to sell is complete, and to such a sale all the world are, or may be, parties. The assurer may buy if he please; so may the *287 original proprietor, or any stranger. He who does so, does it at his own peril; and as tbe owner, in case be purchase, cannot throw the loss, if any, on the underwriter, so neither can the latter come in for the profits resulting from the bargain, unless, indeed, the assured continue, as is alleged, agent of the assurer. But whence is this authority derived ? Is it from the policy ? That confers a power only to sue labor, and travel, in case of misfortune, for the defence, safeguard, and recovery of the goods insured, without prejudice to the insurance.”
From these terms it is evident the authority of the assured and his factors contends only to cases in which, by their exertions, the property may, be rescued from an impending peril. That is, they may use all diligence, and incur any expense, on the underwriter’s account, to prevent a condemnation. But never before was it urged that he, or his consignees, had a right to purchase property for the account and risk of the underwriter.- Mischievous, indeed, would such an unlimited authority prove to the underwriters themselves. They would become merchants as well as underwriters, and be exposed to all the hazards to which the indiscretion or avarice of foreign agents, chosen by others, might expose them. They would never know when their liability on a policy ceased. * After paying their whole subscription, as they have done here, they might be called on for a second loss, greater, possibly, than the first, occasioned by an imprudent speculation abroad, which they themselves, if on the spot, would not have made. What has been done in this case, shows the hazards to which ^hey would be exposed, if the power of the assured or his agents be as great as has been asserted. Messrs. Grrevinge & Co. first purchase the cargo, and that before its condition is known; they then sell it, and after reimbursing themselves, invest the balance in brandy and wine, for account of the defendants, to whom they are accordingly shipped. These brandies and wines are sold by the defendants in New York, *288 and because a profit has accrued, the plaintiffs very modestly claim it. But let tbe case be reversed. If there bad been a loss, which might well have happened, in a transaction somewhat complicated, would the underwriters have been willing to make it good ? If the Apollo’s cargo, as was supposed, had been greatly damaged, if the markets had fallen at Malaga, and a great loss had ensued in that way, or by bad debts; if the Apollo had been shipwrecked on her return to the United States, and a second total loss had thus taken place, or if the brandy and wine had come to a bad market here, how would the plaintiffs, in either of these cases, have been astonished to be called on to make good the injury I They would have said, and there would have been no answering them, “ Show us the authority under which you have been trading on our account. You have been speculating for your own ' benefit, and at your own risk, and are now for shifting the loss on us.” If the defendants could not have compelled the plaintiffs to bear them harmless, and that they could not with me admits no doubt, there must be an end to this question. It cannot be endured, nor did the plaintiffs’ counsel pretend, that underwriters, under circumstances of this kind, might silently wait until a close of the adventure, and then announce their election whether it should be on their account or not. It would be unjust, in the extreme, to let them participate in, nay, take the whole of the gains, without furnishing any portion of the capital, and yet exonerate them from all loss. Qui sentit commodum, sentiré debet et onus, but here the underwriters would reap all the advantage, leaving the assured to bear the whole burden, and to submit to a loss without even a chance of benefit to themselves. If it be insisted that the *plaintiffs must have made good a loss on this adventure, and such was the position of their counsel, why are we not told under what form of action this responsibility can be enforced, or on what clause in the policy, or on what other undertaking, on their part, it can be supported? The *289 truth is, it is the first time a pretension of this kind has ever been advanced, and the plaintiffs themselves, although there be a profit here, will soon be convinced it is their interest to abandon similar claims in future. Whatever they may think, it will not be long before they will find themselves losers, if we give our sanction to the principle on which alone they can succeed. Numerous will be the claims made on them for bad speculations of this kind, while those which prove profitable will be carefully con cealed from their view. Nothing is more common than sales for the benefit of parties ultimately concerned. This arises from the uncertainty which often exists, at the time of sale, as to the real owner. But seldom, if ever, have we before heard of a purchase on account of an uncertain vendee. A purchase is always made for the party whose money is employed. If so, what difficulty can remain as to the persons entitled to the profits in this instance ? Did the plaintiffs supply funds? Not a cent. Would they have paid a bill drawn by Grevinge & Oo. for the amount of the purchase ? They would have regarded such a measure as an unwarrantable liberty in those gentlemen, and without ceremony have dishonored their draft.
But this demand, it is said, is not without precedent, and we are referred to a decision in England, and to another of our own, as authorities in point. The case of M‘Masters v. Shoolbred, 1 Esp. Rep. 236, decided by Lord Kenyon at nisi prius, resembles in nothing the one now under consideration. It was an action on a policy on a ship which had been captured and purchased by the master, after eon demnation, for the owners. As no abandonment had been made while the vessel was in the hands of the captors, and the loss continued total, Lord Kenyon considered the owners entitled to recover only the sum paid to the captors, with certain repairs that had been rendered necessary by the capture. The ship having come to the owners’ possession, before an abandonment, or a suit brought, he considered it as immaterial how this restoration took place, and regarded the price paid as the quantum of the loss occasioned by the peril insured against. So, says he, if a ship be sunk and weighed up again, and thus restored to the owners, they have *only a right to go for an average loss. It deserves notice, that even in this case his lordship, and the counsel, admitted “ that the insured might have abandoned and thus made the loss total.” It inevitably follows that the underwriters, if an abandonment had taken place, would have nothing to do with the purchase. If the defendants here were suing on the policy, and had made no abandonment in season, they would probably have recovered nothing more than the sum which they paid for the cargo; but having abondoned, they would, under this very opinion of Lord Kenyon, be mtitled to claim as for a total loss, notwithstanding the-purchase in Malaga. This decision, therefore, though cited by the plaintiffs, is an authority directly against them. They have been equally unfortunate in their allusion to the case of Saidler & Craig v. Church, in this court. That action was also on the p>olicy, and whether the loss were total, or partial, was the only question. The vessel insured, having been captured, libelled in the admiralty, and condemned, was purchased by the master for the owners, who had fitted her out, and sent her on another voyage. The owners, on advice of the capture, but without knowledge of the condemnation or the purchase, abandoned to the underwriters. The court gave judgment as for a partial loss only, considering the sum paid by Saidler & Craig as the amount thereof. Although this was going further than was done in the case of M‘Masters v. Shoolbred, where there was no abandonment, it will not help the plaintiffs, for in neither of these instances were the vessels, when repurchased, regarded as belonging to the underwriters, but, on the contrary, to the assured, and because they had been restored to them at a-certain price, the sum thus paid was considered as the injury sustained by the disaster, by a reimbursement whereof a complete indemnity *290 would be obtained. If these vessels had belonged to the assurers, as it is pretended these goods did, they might have paid as for a total loss in the firgt instance, and then sold, or fitted them out themselves, or called on the plaintiffs for what they might have earned. But if this last decision be at all favorable to the present claim, it is greatly shaken, if not entirely overturned, by that of Abbott v. Broome, Vol. 1, p. 292. Being of counsel in both these causes, no opinion was given by me in either. The judgment last rendered, however, as it respects the effect of a purchase by the assured, is more consonant to the law of insurance than the principle adopted in the former. It has *ever appeared to me that with a purchase after abandonment and condemnation the underwriter has nothing to do; and that it is better for him it should be so, and I should have thought that since the case of Abbott v. Broome, such would necessarily have been our judgment were the question again to occur; for most certainly the facts there disclosed were much stronger against the assured’s pretentions to a total loss, than those which appeared in the other, and yet they were determined to be well founded. Saidler & Graig did not purchase until after a capture and condemnation, to neither of which were they, in any degree, accessory; but the survey and condemnation, in the other instance, were produced on the application, and in a great measure at the request, of the supercargo; who was a part owner. In the first ease to practice a fraud was impossible ; and yet nothing is more easy, or more common, than to procure partial surveys and fraudulent condemnations, in foreign ports, when an assured wishes to break up a voyage at the expense of an underwriter. If, then, the case of Saidler & Craig v. Church be considered as no authority since that of Abbott v. Broome, which would have been my opinion, the plaintiffs are not only without the semblance of a precedent of our own to justify their demand, but as far as there is any analogy between the present case and that of *291 Abbott v. Broome, the determination of this court is against them.
It was said, on the argument, that if the assured ransom, the underwriter is bound by his act, and must pay, whether it be a good or bad bargain. This is true, for such act being within his authority, he may, to avoid the greater evil of condemnation, or entire loss, pay a fair price for a restoration of the property, which then belongs to himself and not to the underwriter, who is only held to make good the loss occasioned by the capture, which is the sum paid as a ransom. The effect of a ransom is not to change the property, but to settle the extent of the loss. Upon the whole, I am of opinion, that after a capture, a condemna tion, an abandonment, and payment as for a total loss, the asssurer cannot call on the merchant to account for the profits which he may have made, in consequence of his agent’s purchasing, with Ms funds, the cargo of the captors subsequent to a condemnation; but that such purchase, being with the money of the assured, must be at his risk, and for his exclusive benefit, and that the defendants must of course have judgment. 1 Caines’ Rep. 303, n.(a)
^Thompson, J.
not having heard the argument, gave no opinion.
Judgment for the plaintiffs.